UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE ESTATE OF MICHAEL SHANE
LACKO, by his Personal Representative,
Mindy Griswatch,

Case No. 11-12361

Honorable Nancy G. Edmunds

    Plaintiff,

v.

MERCY HOSPITAL, CADILLAC, assumed
name for TRINITY HEALTH - MICHIGAN,

    Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [5]**

This matter comes before the Court on Defendant Mercy Hospital, Cadillac's motion to dismiss for failure to state a claim and lack of subject matter jurisdiction, pursuant to FRCP Rules 12(b)(6) and 12(b)(1). Plaintiff Estate of Michael Shane Lacko alleges two counts in its Complaint against Defendant: (1) Defendant violated the Emergency Medical Treatment and Labor Act ("EMTALA"), and (2) Defendant committed medical malpractice.

Defendant argues that Plaintiff has failed to state a cause of action under EMTALA. Because Plaintiff brought the medical malpractice claim under pendant jurisdiction, Defendant argues that if the EMTALA claim is dismissed, the medical malpractice claim should be dismissed for lack of subject matter jurisdiction.

For the reasons set forth below, Defendant's motion to dismiss is GRANTED.

**I.	Facts**

1

At 2:07am, on June 28, 2009, police officers brought Plaintiff's decedent Shane Lacko ("Lacko") to Defendant Mercy Hospital's emergency department. (Compl. ¶¶ 25, 91.) The police officers found Lacko in a park, where Lacko started to cry and told the officers that he had no place to sleep, was recently homeless, his ex-wife was not letting him see his son, and he was depressed. (*Id.* at ¶¶ 27, 88.) Lacko told police that he "was thinking about getting a hose and ending it all tonight." (*Id.* at ¶¶ 14, 26, 89.) Police relayed this information to Defendant when they brought Lacko to Defendant's emergency room. (*Id.* at ¶ 15.)

Lacko told Defendant that he had purposefully overdosed by taking an unknown amount of methadone for tooth pain at 1pm on June 27, 2009 and that he had obtained the methadone from a friend. (Compl. ¶¶ 20, 28, 93.) Lacko also informed Defendant that he had a history of psychiatric illness, including depression and bipolar disorder. (*Id.* at ¶¶ 28, 93.) Lacko's admitting diagnosis was depression. (Compl. Ex. A.) The initial emergency room report states that Lacko "took friend's methadone for tooth pain, now nauseated. Also kicked out of house. Sleeping at van on the lake, brought in by police. He is not suicidal at this time." (Compl. at Ex. E.) No specific psychiatric or mental health examination is documented as having been conducted. (Compl. at ¶ 94.)

Defendant's records indicate that at admission Lacko was alert and his chief complaint was nausea. (Compl. Ex. E.) The admission face sheet also listed Lacko as disabled and on Medicaid of Michigan. (Compl. ¶¶ 12, 91.) At 2:33am, less than half an hour after arriving at the emergency department, Defendant gave Lacko 4mg of Zofran for nausea. (*Id.* at ¶ 95.) At 2:34am, Defendant took a urine sample from Lacko for drug testing. (*Id.* at ¶ 96.) At 3:30am, Defendant gave Lacko 2mg of Ativan because Lacko was

"somewhat agitated and wanted something to help him sleep." (*Id.* at ¶ 97; Compl. Ex. C.)

At 5:21am, Lacko suffered respiratory arrest. (Compl. ¶ 97.) Lacko's respiratory arrest responded to IV Narcan, an anti-narcotic drug. (*Id.* at ¶ 22.) After receiving the Narcan, Lacko awoke, became verbal, and his respiration returned back to normal. (*Id.* at ¶ 98; Compl. Ex. C.)

Defendant diagnosed Lacko with a narcotic overdose and Defendant's emergency department's plan was to "watch patient for a period of time and then medically clear to home." (Compl. Ex. C.) Despite diagnosing Lacko with an intentional overdose, Defendant did not request or obtain tests that would reveal how much methadone Lacko ingested. (Compl. ¶¶ 20, 21, 23.) Plaintiff alleges that Defendant discharged Lacko without giving Lacko any treatment for his suicide attempt or suicidal ideation by not providing a consultation with a psychiatrist or evaluation of Lacko's suicidal status prior to discharge. (*Id.* at ¶¶ 35, 38, 42.) Defendant's emergency department report indicates that the psychiatric evaluation of Lacko determined that he was "oriented times three and he is not suicidal." (Compl. Ex. C.)

Defendant discharged Lacko on June 28, 2009 at about 8:57am after Lacko ate breakfast. (Compl. ¶¶ 42, 102.) Upon discharge, Defendant gave Lacko a standard form of "Patient Education Materials" for an intentional overdose, and these materials state:

> You have been evaluated and treated for taking a drug or chemical product with the intention of harming yourself . . . an intentional overdose is usually a sign of depression or excessive anger at yourself or another person. In order to reduce the risk of harming yourself, we advise that you have an evaluation by a psychiatrist.

(Compl. ¶ 105; Compl. Ex. F.) On the discharge form, Defendant provided the toll-free number for the Third-Level Crisis Center and indicated that Lacko should follow up with

3

them on June 28, 2009, the same day he was discharged. (Compl. Ex. F.) Defendant further advised Lacko to follow up with Dr. Dominic Kiomento, M.D. in 2-4 days. (Compl. ¶ 106.) Additionally, the discharge instructions state, "If you are being discharged home, you must stay with a responsible adult until you are evaluated by a psychiatrist. If you are being discharged for immediate evaluation at a psychiatric hospital or clinic on a voluntary basis, you must go directly there in the company of a responsible adult." (*Id.*)

No responsible adult accompanied Lacko out of the hospital or to the crisis intervention center. (*Id.* at ¶ 107.) Plaintiff alleges that Defendant discharged Lacko without contacting any family members, without any treatment of his suicidal ideation, and without being provided any crisis intervention. (*Id.* at ¶¶ 33, 34.) Defendant had the means and an established procedure for placing patients on a legal 72-hour psychiatric hold if necessary. (*Id.* at ¶ 40; Compl. Ex. G.)

Police found Lacko's body in his van at 11:27pm on June 30, 2009, two and a half days after he was released from Defendant's emergency room. (Compl. ¶¶ 49, 109.) In his report, the officer that found Lacko stated that it appeared that Lacko had been in that position "for quite some time." (Compl. ¶¶ 49, 110; Compl. Ex. H.) The Supplemental Report for a Pending Certificate of Death indicates that Lacko committed suicide at 8:00pm on June 30, 2009 by taking "an overdose of methadone." (Compl. Ex. I.) The cause of Lacko's death was determined to be methadone intoxication associated with bilateral pneumonia. (Compl. ¶ 46.)

**II. Motion to Dismiss Standard**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. In a light most favorable to the plaintiff, the court must assume

that the plaintiff's factual allegations are true and determine whether the complaint states a valid claim for relief. *See Albright v. Oliver*, 510 U.S. 266 (1994); *Bower v. Fed. Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996).

To survive a Rule 12(b)(6) motion to dismiss, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and emphasis omitted). *See also Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007). "[T]hat a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements do not suffice." *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009). The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 1950 (internal quotation marks and citation omitted). Moreover, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id.* (internal quotation marks and citation omitted). While legal conclusions provide the framework of a complaint, those conclusions must be supported by factual allegations. *Id.*

A rule 12(b)(6) analysis generally forbids a court from considering documents outside the pleadings, but when a document is referred to in the complaint and is central to the plaintiff's claim, the court may consider it. *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999). This does not convert a motion to dismiss into a motion for summary judgment. *Id.* In a motion to dismiss, the court may take into account exhibits

attached to the complaint. *See Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997) (internal quotations and citation omitted).

### III. Analysis

Plaintiff brings claims under the Emergency Medical Treatment and Active Labor Act, ("EMTALA") 42 U.S.C. § 1395dd. After some highly publicized incidents where hospital emergency rooms allegedly failed to provide a medical screening or improperly transferred or discharged a patient, based only on the patient's financial inadequacy, Congress enacted EMTALA. Congress intended this legislation to prevent hospitals from dumping patients who suffered from an emergency medical condition because they lacked insurance to pay the medical bills. *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 268 (6th Cir. 1990); *Thorton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1134 (6th Cir. 1990). The statute was not designed or intended to establish guidelines or standards for patient care, provide a suit for medical negligence, or substitute for a medical malpractice claim. *Moses v. Providence Hosp. and Med. Ctrs., Inc.*, 561 F.3d 573, 578 (6th Cir. 2009). Under EMTALA, hospitals have two requirements: (1) to administer an appropriate medical screening, and (2) to stabilize emergency medical conditions. Here, Plaintiff alleges that Defendant failed to satisfy either of these requirements.

#### A. Appropriate Medical Screening

Plaintiff alleges that Defendant failed to provide appropriate medical screening, as required by EMTALA, by: (1) failing to determine that Lacko was suffering from acute suicidal ideation and suicide attempt by overdosage; and (2) failing to determine the amount of methadone Lacko had ingested or making a determination of the lethality or

extent of his overdosage. Defendant argues that it performed an appropriate medical screening because Lacko received the same treatment as any other paying patient would have received and that Plaintiff has failed to properly allege an improper motive.

Under EMTALA, the medical screening requirement states:

> In the case of a hospital that has a hospital emergency department, if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42 U.S.C. § 1395dd(a). The Sixth Circuit interpreted the "vague phrase 'appropriate medical screening' to mean a screening that the hospital would have offered to any paying patient." *Cleland*, 917 F.2d at 268. The court in *Cleland* went on to determine that "appropriate" meant care "similar to care that would have been provided to any other patient, or at least not known by the providers to be insufficient or below their own standards." *Id.* at 271. A hospital that provides a nonexistent or substandard–by its own standards–medical screening "for any reason (including, without limitation, race, sex, politics, occupation, education, personal prejudice, drunkenness, spite, etc.) may be liable under this section." *Id.* at 272.

In the Sixth Circuit, whether a hospital administered an "appropriate" screening refers not only to the hospital's standards, but also to the motives with which a hospital acts. *Id.* at 272. If a hospital acts in the same manner as it would have for the usual patient, then the screening provided is appropriate and "a plaintiff fails to establish a claim for violation of the screening requirement where there is no evidence of disparate treatment

7

based on an improper motive." *Garrett v. Detroit Med. Ctr.*, No. 06-10753, 2007 WL 789023, at *3 (E.D. Mich. March 14, 2007); *see also Stringfellow v. Oakwood Hosp. and Med. Ctr.*, 409 F.Supp.2d 866, 870–71 (E.D. Mich. 2005) (granting motion to dismiss plaintiff's screening claim for failure to allege substandard treatment or an improper motive).

### 1.  Appropriate Screening

In this case, Lacko was brought to Defendant's emergency room by police at 2:07am. Defendant admitted Lacko into the emergency room and filled out an intake form, stating that Lacko's admitting diagnosis was depression. According to Defendant's initial emergency room report, Defendant recorded Lacko's: mode of arrival, chief complaint, history of present illness, past medical history, medications, social history, family history, review of systems, physical examination, vital signs, Heent, neck, and chest.[1] (Compl. Ex. E.) Under history of present illness, the report indicates, "He is not suicidal at this time." (*Id.*) This emergency room report indicates that Lacko's chief complaint upon admission was nausea, and less than half an hour after being admitted, Defendant administered Zofran to Lacko to treat the nausea.

Additionally, a later emergency room report indicates that Defendant further examined and recorded results for Lacko's cardiovascular, abdomen, extremities, neurologic, psychiatric, laboratory, emergency department course of action, diagnosis, and plan.[2] (Compl. Ex. C.) Under psychiatric, the report indicates, "The patient is oriented

---

[1] Whether this document is the complete report is unclear. Only one page is attached to the Complaint as Exhibit E.

[2] This exhibit is only one page and it indicates that it is "page 2 of 3" of the emergency room report. Plaintiff did not attach the other pages of this document.

times three and he is not suicidal." (*Id.*) Defendant also performed a drug test, using Lacko's blood and urine. However, neither of these tests were used to determine the amount of methadone in Lacko's system.

Plaintiff alleges that an appropriate medical screening should have included an examination by a psychiatrist or some sort of psychological evaluation and that Defendant should have determined the amount of methadone in Lacko's system. The test for an "appropriate" screening is not meant to require the best possible medical procedure, but only those procedures that the hospital would normally conduct on any other paying patient. In *Cleland,* the Sixth Circuit rejected the contention "that 'appropriate' denotes, at a minimum, the full panoply of state malpractice law, and at a maximum, includes a guarantee of successful result." *Cleland*, 917 F.2d at 271.

Plaintiff asserts that upon discharge, Defendant gave Lacko a "Patient Education Materials" form for an intentional overdose. The Patient Education Materials gives an introduction, information for home care, follow-up, and under what circumstances the patient should return to the hospital. The home care section discusses some possible consequences in cases where IPECAC or liquid charcoal were used. The introduction indicates that "the exact symptom will depend on the type of drug or chemical taken." These both support the inference that this form is a standard form given to all those patients that fit under the "Overdose, Intentional, Adult" diagnosis. The form also states:

> You have been evaluated and treated for taking a drug or chemical product with the intention of harming yourself. There is no sign of toxic effect at this time. It is unlikely that any new symptoms will appear. As a safeguard, watch for new symptoms during the next 24 hours . . . An intentional overdose is usually a sign of depression or excessive anger at yourself or another person. In order to reduce the risk of harming yourself, we advise that you have an evaluation by a psychiatrist.

9

This language indicates that Defendant's standard practice is to advise patients who have intentionally overdosed to see a psychiatrist. This same advice was given to Lacko. Additionally, Defendant told Lacko to follow up with the Third-Level Crisis Center the same day of his discharge and to follow up with Dr. Dominic Kiomento, M.D. in 2-4 days.

In the Complaint, Plaintiff alleges that Defendant "failed timely to request a consultation with and/or an examination by other members of [Defendant's] staff, as required by [Defendant]'s own protocol, procedures, guidelines, policies, rules or the standard of care." (Compl. ¶ 118(O).) Because this case is before the Court on a motion to dismiss, the Court must view the factual allegations in the light most favorable to the Plaintiff. Without knowing what Defendant's standard procedures are in a case where a patient presents with depression, nausea, and has intentionally overdosed on a narcotic, the Court finds that dismissal of Plaintiff's claim that Defendant failed to provide Lacko with an appropriate screening by its own standards is not proper at this time.

### 2. Improper Motive

There is a second prong of the "appropriate medical screening" requirement, and Plaintiff must satisfy both prongs in order to properly state a claim under EMTALA for inappropriate medical screening. The second prong requires Plaintiff to allege an improper motive. Defendant claims that Plaintiff has failed to do this. Plaintiff, in its Complaint, indicates that Defendant's emergency room admission face-sheet listed Lacko is insured by Medicaid of Michigan. (Compl. ¶¶ 12, 91.) Additionally, Plaintiff alleges that Lacko received disparate treatment. (Compl. ¶ 54.) Other than the one-sentence assertion in the Complaint that Lacko received disparate treatment, Plaintiff offers no factual allegations that Lacko's treatment would have been different had Lacko not been on Medicaid. The

10

Sixth Circuit, in *Cleland*, stated:

> There is not the slightest indication that this outcome would have been any different for a patient of any other characteristic. Had his sex, race, national origin, financial condition, politics, social status, etc., been anything whatsoever, as far as can be gleaned from the complaint, the outcome would have been the same. Under these circumstances, we hold that the complaint simply fails to allege any inappropriateness in the medical screening in the sense required by the Act.

*Cleland*, 917 F.2d at 271. Additionally, the Eastern District of Michigan found that the defendant's motion to dismiss should be granted where the plaintiffs did not allege that the hospital's failure to conduct tests was due to the defendant's sex, race, national origin, financial condition, political affiliation, social status, or any other impermissible motive. *Broughton v. St. John Health Sys.*, 246 F.Supp.2d 764, 769 (E.D. Mich. 2003) (Gadola, J.).

Plaintiff here, as in *Cleland* and *Broughton*, has simply failed to allege that Defendant had any improper motive. In the Complaint, there is no factual basis, nor is there any allegation that had Lacko not been on Medicaid, Defendant would have performed any differently. Plaintiff, in its response to Defendant's motion to dismiss, argues that because Lacko was homeless and on Medicaid: Defendant did not have a mental health professional evaluate Lacko; Defendant did not determine the amount of methadone present in Lacko's system; and Defendant never documented basic questioning of whether Lacko had a history of violence to himself or others, prior suicide attempts, or history of substance abuse.[3]

Other than this assertion, there is no indication that Lacko's living arrangements or

---

[3] As to the third accusation, Plaintiff attached to its Complaint Exhibit E, which indicates that Defendant took a history of the present illness, past medical history (including psychiatric illness), medications, social history (including tobacco, alcohol, and drug use), family history, and a number of other topics.

insurance played any role whatsoever in his medical treatment. There is nothing to suggest that anyone at Defendant's hospital took that information into consideration or, because of that information, altered or failed to administer any tests, procedures, or diagnoses that would have otherwise been made or done. The only indication that Lacko was given disparate treatment is Plaintiff's bare allegation.

On a motion to dismiss, while the Court takes the factual allegations in a light most favorable to the Plaintiff, "threadbare recitals of all the elements of a cause of action, supported by mere conclusory statements do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. at 1949. If the facts do not permit the Court to infer more than the possibility that there was an improper motive, the complaint has alleged – but it has not shown – that Plaintiff is entitled to relief. *Id.*

Plaintiff has alleged, but not shown, that Defendant had an improper motive. Defendant's motion to dismiss Plaintiff's claim for inappropriate medical screening is GRANTED.

### B. Stabilizing an Emergency Medical Condition

Plaintiff asserts that being acutely suicidal constitutes an "emergency medical condition" within the definition of EMTALA and that Defendant had actual knowledge of Plaintiff's suicidal ideation, intentional overdose, and depression. Plaintiff further alleges that Defendant failed to stabilize Lacko's emergency medical condition by failing to provide an evaluation by a psychiatrist or other health professional to determine if Lacko was no longer a threat to himself or if his methadone levels were toxic or not. Defendant argues that it did not determine that Lacko had an emergency medical condition, so the

stabilization requirement is not applicable. Alternatively, Defendant argues that if an emergency condition did exist, that Lacko was stabilized before being released, in compliance with EMTALA.

### 1. Standard

Under EMTALA, the hospital's second duty is:

> If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either–(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. § 1395dd(b)(1). This section of EMTALA has a two-part requirement, (1) the hospital determines there is an emergency medical condition, and (2) the hospital must stabilize the medical condition before transferring (or discharging) the patient. For the stabilization and transfer requirements to apply, the hospital must first determine that the individual has an emergency condition. *Broughton*, 246 F.Supp.2d at 773. In order to require stabilization, "the hospital physicians must actually recognize that the patient has an emergency medical condition; if they do not believe an emergency medical condition exists because they wrongly diagnose the patient, EMTALA does not apply." *Moses*, 561 F.3d at 585; *see also Roberts ex rel. Johnson v. Galen of Virginia, Inc.,* 325 F.3d 776, 786 (6th Cir. 2003).

An "emergency medical condition" exists where the patient has severe symptoms such that the absence of immediate medical attention could reasonably be expected to result in: (1) placing the patient's health in serious jeopardy, (2) serious impairment to bodily functions, or (3) serious dysfunction of any bodily organ or part. 42 U.S.C.

13

§ 1395dd(e)(1). The Sixth Circuit has held that a mental health emergency could qualify as an emergency medical condition under the language of EMTALA. *Moses*, 561 F.3d at 585. In *Moses*, the court stated, "A legitimate possibility that the patient might commit suicide would appear to 'place the health of the individual . . . in serious jeopardy,' and could thus fall under the category of 'emergency medical condition.'" *Id.* at 585-86. A patient with an emergency medical condition is "stabilized" when "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during" the patient's release from the hospital. 42 U.S.C § 1395dd(e)(3)(B). Therefore, a hospital may not release a patient with an emergency medical condition without first determining that the patient has actually stabilized. *Moses,* 561 F.3d at 583.

### 2. Emergency Medical Condition

In order for Defendant to have been required to stabilize Lacko before discharging him, Defendant must have determined that Lacko had an emergency medical condition. When Lacko was brought into the emergency room by the police, Defendant was informed that Lacko was depressed and had told police he "was thinking about getting a hose and ending it all tonight." Lacko's admitting diagnosis was depression, but the initial emergency room report indicated that Lacko's chief complaint was nausea and "he is not suicidal at this time." Defendant treated Lacko's nausea by administering Zofran to him. When Lacko suffered respiratory arrest, three hours after being admitted to the hospital, Defendant administered Narcan, which returned Lacko's respiration back to normal.

In a later emergency room report, Defendant diagnosed Lacko with an intentional narcotic overdose and indicated: "PSYCHIATRIC: The patient is oriented times three and

14

he is not suicidal." Defendant treated and monitored Lacko in the emergency room until his discharge at approximately 8:57am, about 7 hours after his admission. Other than the methadone ingestion that occurred approximately 13 hours prior to his admission to the hospital, and his statement to police before he was admitted to the hospital that he "was thinking about getting a hose and ending it all tonight," Plaintiffs do not allege that Lacko ever exhibited any behaviors or made any statements that would indicate that Lacko was suicidal at the time he was at the hospital and being treated by Defendant. The emergency room records, attached to Plaintiff's Complaint, do not indicate that Lacko ever expressed any suicidal ideation and instead, state that Lacko was not suicidal.

Defendant knew that Lacko had intentionally overdosed on methadone, he had told police that he was "thinking about ending it all," and he was depressed. However, the hospital staff members must believe an emergency medical condition exists for EMTALA to apply. *Moses*, 561 F. 3d at 585. "Only actual knowledge of an emergency medical condition [by Defendant]—not simply the existence of facts that should have put Defendant on notice—triggers a duty to stabilize a patient pursuant to § 1395dd(b) of EMTALA." *Burd v. Lebanon HMA, Inc.*, 756 F.Supp.2d 896, 906 (M.D. Tenn. 2010) (finding that because the hospital diagnosed the patient with acute anxiety and determined he was stable, it did not have actual knowledge of an emergency medical condition, despite that the patient had been admitted to the same hospital that morning for attempted suicide by hanging and the police officer who brought him in that evening informed the hospital that the patient had threatened to kill himself). In *Burd*, the court stated:

> EMTALA is not a substitute for state malpractice claims. A claim under § 1395dd(b) must demonstrate that a defendant has actual knowledge that an emergency medical condition exists, and the Court is not made aware of

> an exception for instances in which a defendant hospital's shoddy evaluation should have produced actual knowledge of an emergency medical condition, but did not.

Burd, 756 F.Supp.2d at 910.

Any hospital employee or agent that has knowledge of a patient's emergency medical condition might potentially subject the hospital to liability under EMTALA. *Moses*, 561 F.3d at 585. However, to the extent Plaintiff argues that Defendant was negligent in failing to recognize that Lacko had an emergency medical condition, such an allegation does not fall under EMTALA and is reserved for state malpractice law. *Id.*

In the Complaint, Plaintiff alleges that an emergency condition existed but falls short of alleging that Defendant knew or determined Lacko had an emergency condition. The Complaint states: (1) Lacko told Defendant that he had taken an unknown amount of his friend's methadone, had been kicked out of the house and had a history of psychiatric illness, "therefore an emergency medical condition did exist and [Defendant] had a duty to render those services that are necessary 'to stabilize' the patient's condition or transfer him to another facility;" (2) Lacko was a self-destructive patient, voicing suicidal ideation, had acted on his suicidal ideation by taking an overdose of methadone and had a history of mental illness, depression, "therefore an emergency medical condition did exist and appropriate treatment to stabilize his condition was required;" and (3) Lacko presented to Defendant's hospital in the midst of an acute suicidal episode, an obvious danger to his life and at risk of fatal harm to himself, "therefore an emergency medical condition did exist and appropriate treatment to stabilize his condition was required." (Compl. ¶¶ 28, 30, 31.)

Additionally, the Complaint explicitly states that Defendant failed to make the required determination that Lacko had an emergency medical condition:

- [Defendant] failed to determine that . . . Lacko was suffering from acute suicidal ideation. (Id. ¶ 16.)

- [Lacko] was summarily noted on the emergency department medical record to not be suicidal, but no specific psychiatric or mental health examination is documented. (Id. ¶ 94.)

- [Defendant] failed to exercise reasonable skill and diligence to timely diagnose [Lacko]'s condition, to wit; his acute suicidal condition. (Id. ¶ 118(A).)

- [Defendant] failed to timely recognize patient's injury and/or abnormal conditions to and therefore failed to timely diagnose patient's condition and/or failed to timely treat same, to wit; his acute suicidal condition. (Id. ¶ 118(P).)

- [As a result of] the failure to appropriately assess his risk for self-harm and suicide on June 28, 2009 [Lacko thereafter committed suicide]. (Id. ¶ 121.)

- The manner or mechanism of this death began with the failure of emergency medicine physicians and nurses at [Defendant's Hospital] to properly assess Shane Lacko's risk of self-harm and suicide on June 28, 2009, despite all the background historical information and circumstantial evidence available to them. (Id. ¶ 122.)

- The failure to timely diagnose and appropriately manage suicidal ideation led to the inappropriate discharge of Shane Lacko . . . (Id. ¶ 123.)

- The failure to properly assess [Lacko] for risk of suicide, the unmeritorious conclusion that he was not suicidal and the inappropriate decision to release him from the emergency department after respiratory arrest unaccompanied by a responsible adult on the morning of June 28, 2009, all constituted a breach in the standard of practice or care . . . (Id. ¶ 138.)

In these eight separate paragraphs of the Complaint, Plaintiff alleges that Defendant *failed* to determine and diagnose Lacko's emergency condition. Assuming all the allegations in the Complaint are true, Plaintiff has failed to appropriately plead a stabilization claim under EMTALA.

Because Defendant did not determine Lacko had an emergency medical condition,

17

the stabilization requirement does not apply. Defendant's motion to dismiss the stabilization claim is GRANTED.

### C. Leave to Amend

Pursuant to Federal Rule of Civil Procedure 15(a), leave to amend is freely granted where justice so requires. Granting leave freely "reinforces the principle that cases should be tried on their merits rather than the technicalities of pleadings." *Tefft v. Seward*, 689 F.2d 637, 639 (6th Cir. 1982); *Broughton*, 246 F.Supp.2d at 775. However, a motion to amend a complaint should be denied if the amendment is brought in bad faith or for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile. *See Foman v. Davis*, 371 U.S. 178 (1962).

In its response, Plaintiff seeks leave to amend to cure any defects in either the screening or stabilization claim. The current complaint and attached exhibits contain no indication of any improper motive and Plaintiff has already alleged, numerous times, that Defendant failed to determine that Lacko had an emergency medical condition. EMTALA was enacted to prevent hospital emergency rooms from dumping patients that could not afford treatment. It was not intended to provide a suit for medical negligence or substitute for a medical malpractice claim. Here, Plaintiff sets forth a potential medical malpractice claim, but the allegations do not describe a case that EMTALA was intended to cover. Therefore, this Court finds that granting Plaintiff leave to amend would be futile. Plaintiff's request for leave to amend is DENIED.

### D. State-Law Medical Malpractice Claims

Defendant argues that the medical malpractice claims should be dismissed for lack

of subject matter jurisdiction if this Court dismisses the EMTALA claims. Plaintiff, in its response, does not address this argument. A district court may retain supplemental jurisdiction over state law claims after dismissal of the federal claims. 28 U.S.C. § 1367(c)(3). In making the determination, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.,* 994 F.2d 1178, 1182 (6th Cir.1993).

Given the early stage of these proceedings, this Court declines to retain supplemental jurisdiction over the state-law medical malpractice claims. Those claims are dismissed without prejudice for lack of subject matter jurisdiction.

## IV. Conclusion

For the reasons stated above, the Defendant's motion to dismiss is GRANTED. Plaintiff's EMTALA claims are dismissed with prejudice for failure to state a claim and Plaintiff's state-law medical malpractice claims are dismissed without prejudice for lack of subject matter jurisdiction.

s/Nancy G. Edmunds  
Nancy G. Edmunds  
United States District Judge

Dated: November 3, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 3, 2011, by electronic and/or ordinary mail.

                              s/Carol A. Hemeyer
                              Case Manager